**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| | ) | **Case No. 15-60831** |
| **JW RESOURCES, INC., *et al.*,[1]** | ) | **(Jointly Administered)** |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF JOSHUA PORTER IN SUPPORT OF
FIRST DAY MOTIONS AND APPLICATIONS**

I, Joshua Porter, hereby declare as follows:

1.      I am a director JW Resources, Inc. and designated representative ("**Designated Representative**") to the above captioned debtors and debtors-in-possession (collectively, the "**Debtors**") in their bankruptcy cases.  I have been involved in the Debtors' preparation for the commencement of these bankruptcy cases.

2.      I have familiarity with the day-to-day operations, business affairs, books and records of the Debtors.  I am authorized by the Debtors to submit this Declaration.  I am familiar with the Debtors' relationships with their lenders, lessors, trade vendors, and other parties necessary to the Debtors' ongoing business operations.

3.      I submit this Declaration pursuant to 28 U.S.C. § 1746 in support of the Debtors' voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and first day motions and applications filed concurrently herewith.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses):  JW Resources, Inc. (6400), Straight Creek Coal Mining, Inc. (9073), and SCRB Properties, Inc. (1609), SCRB Processing, Inc. (6470).

experience and knowledge of the Debtors' businesses and their financial condition.  If called

upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**Commencement of Reorganization Proceedings**

4.     On June 28 and 30, 2015 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to

continue in the possession of their respective properties and the management of their respective

businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     Part I of this Declaration describes the business of the Debtors.  Part II sets forth

the circumstances giving rise to the commencement of these chapter 11 cases.  Part III sets forth

the relevant facts in support of the various first day motions ("**First Day Motions**") and

applications ("**Applications**") filed by the Debtors concurrently herewith.  I am familiar with the

first-day motions and applications filed by the Debtors.

**I.     THE DEBTORS' BUSINESSES**

**A.  Coal Operations**

6.     The Debtors are U.S. producers of thermal coal with mineral reserves, mining

operations and coal properties located in the Central Appalachian ("**CAPP**") regions of

Kentucky.  By and/or through these operations, the Debtors supply high quality coal primarily to

one customer.

7.     JW Resources, Inc. ("**JW Resources**") is the parent and sole shareholder of

SCRB Properties, Inc. and SCRB Processing, Inc., which were formed to hold certain mining

leases and are inactive, as well as Straight Creek Coal Mining, Inc., which is active and operates

coal mines, a preparation plant, and a rail loadout.

8.      JW Resources acquired its assets and business operations from Xinergy Corp. in February 2013 (the "**Straight Creek Acquisition**") for the purchase price of $47,200,000. These assets and business operations of the Debtors comprise what is known as the "Straight Creek" operations located in Bell, Leslie and Harlan Counties, Kentucky, and the "Red Bird" operations located in Bell, Leslie, Knox, and Clay Counties, Kentucky. JW Resources, through its subsidiaries, leases or owns mineral rights to approximately 26,610 acres.

9.      Prior to the Petition Date, the Debtors terminated a majority of their workforce. As of the Petition Date, the Debtors employed approximately 5 employees. None of the employees are unionized.

10.     For the fiscal year ending December 31, 2014, the Debtors estimate sales of 725 thousand tons of coal, of which almost all was produced by the Debtors.  These sales resulted in $52 million of revenues, $2 million of adjusted EBITDA and a net loss of $24 million.  These figures are unaudited and do not include certain audit adjustments that have yet to be recorded.

   **B.  Corporate Structure**

11.     JW Resources is majority owned by Bayside JW Investors, LLC ("**Bayside**"), which owns 74.4% of the outstanding shares of JW Resources.   Balantrove Acquisition Company No. 1 LLC owns 18.6% of the outstanding shares of JW Resources. A series of other co-investors own 7.0% of the remaining shares of JW Resources.

12.     Each of the Debtors was incorporated in the Commonwealth of Kentucky on November 29, 2012.  Currently, the Board of Directors of JW Resources consists of Mr. Lawrence M. Clark, Jr. ("**Mr. Clark**"), me, Mr. Brett Craig ("**Mr. Craig**") and Mr. John Bolduc. The Boards of Directors of the Debtors, other than JW Resources, are identical and consist of: 1)

Mr. Clark, 2) Mr. Porter, and 3) Mr. Craig.  Mr. Clark also previously served as the President and CEO of the Debtors.

## C. **Debt Structure**

13.     The Debtors have approximately $80 million of liabilities, of which approximately $9.5 million is secured debt owed to GB Credit Partners, LLC ("**GB Partners**") and approximately $55 million is secured debt owed to Bayside.  Komatsu Financial Limited Partnership and Bill Miller Equipment Sales, Inc. also purport to have liens on certain equipment owned by Debtor Straight Creek Coal Mining, Inc.  On Friday, May 15, 2015, a tax lien was filed against the Debtors in Bell County, Kentucky in the amount of approximately $405,000. The remaining balance of the Debtors' obligations is comprised of unsecured claims.

### i.     **Secured Debt**

#### 1.     **JW Resources**

14.     JW Resources and its wholly-owned subsidiaries, as borrowers, entered into a Credit Agreement dated February 1, 2013, which was amended and restated on January 30, 2014 (as amended, modified and/or restated from time to time, the "**Straight Creek Bayside Loans**"), with Bayside, as administrative agent and lender. The Straight Creek Bayside Loans provided for up to $60 million in financing: a $15 million revolving loan facility, and a $37 million term loan. As of the Petition Date, approximately $55 million is outstanding on the Straight Creek Bayside Loans.  The proceeds of the Straight Creek Bayside Loans were used to fund the Straight Creek Acquisition, to provide working capital and to fund general corporate purposes. The Straight Creek Bayside Loans are secured by a lien on substantially all of the assets of JW Resources and its wholly-owned subsidiaries.

15.     In addition, JW Resources and its wholly-owned subsidiaries, as borrowers, entered into a Credit Agreement dated January 30, 2014 (as amended, modified and/or restated from time to time, the "**GB Loans**"), with GB Partners, as administrative agent, and 1903 Onshore Funding, LLC, as lender. The GB Loans provided for up to $14.9 million in financing: a $5.5 million revolving loan commitment, and a $9.4 million term loan commitment.  As of the Petition Date, approximately $9.5 million is outstanding on the GB Loans.  The proceeds of the GB Loans were used for the refinancing of a portion of the borrowers' existing indebtedness, to pay certain transaction costs, related fees and expenses, to pay certain management and collateral monitoring fees, to provide working capital and to fund general corporate purposes. The GB Loans are secured by the same collateral securing the Straight Creek Bayside Loans – substantially all of the assets of JW Resources and its wholly-owned subsidiaries.

16.     Bayside, GB Partners, and JW Resources and its wholly-owned subsidiaries are parties to a First Lien/Second Lien Subordination and Intercreditor Agreement dated January 30, 2014 (the "**Intercreditor Agreement**").  The Intercreditor Agreement provides that the GB Loans are senior to the Straight Creek Bayside Loans in terms of lien priority and right to payment.  The Intercreditor Agreement also provides that Bayside is deemed to consent to any use, sale, or lease of cash collateral and debtor-in-possession financing, provided that GB Partners has consented to such use, sale, lease or financing, and such use, sale, lease or financing meets certain criteria laid out in the Intercreditor Agreement, including the requirement that any liens securing debtor-in-possession financing be pari passu with or superior to the liens securing the GB Loans.

### ii.    Unsecured Debt

17.    As of the Petition Date, the Debtors owe unsecured obligations in amounts that will be disclosed in the Debtors' Schedules and Statements of Financial Affairs.

## II.    CIRCUMSTANCES GIVING RISE TO CHAPTER 11 CASES

### a.    Nationwide Issues In the Coal Industry

18.    Leading up to and following the Straight Creek Acquisition in February 2013, there has been a decrease in the demand for CAPP coal, driven primarily by three factors: (i) increased switching by utilities from utilizing coal-fired power plants to utilizing natural gas-fired power plants due to depressed natural gas prices caused by the substantial increase in production from shale formations utilizing new fracking and horizontal drilling techniques, (ii) decreased power production from older coal plants that will be forced to retire as a result of the inability to economically justify the cost of complying with Environmental Protection Agency regulations; and (iii) increased ability of power plants that have historically burned CAPP coal to burn a greater mix of higher sulfur Illinois Basin (ILB) coal due to the installation of newly required environmental controls.

19.    During the period from February 2013 through April 2015, the spot price of coal per ton has decreased by 26%. All these factors contributed to the Debtors' inability to service the GB Loans and Bayside Straight Creek Loans in late 2014.

### b.    Debtors' Extrajudicial Efforts to Restructure

20.    The Debtors' current financial distress and liquidity challenges began in the second half of 2014, when the Debtors' production levels and production costs per ton were significantly worse than projected, leading to financial covenant and other defaults under the Debtors' various loan agreements.

21.     As a result, in early 2015, the Debtors engaged Jeff Wilson of Wilson Energy Advisors to consult with the Debtors to develop a business and mining plan to attempt to address the production and cost issues.

22.     The Debtors have been struggling to maintain their financial commitments under various coal leases because the terms of these leases do not reflect the Debtors' current production levels and the current market conditions.

23.     Despite their significant efforts, the Debtors have experienced production shortfalls that are inconsistent with their business operation projections as well as internal business challenges.  For the months ended May 2015, the Debtors' coal production volume was 39% below levels in the Debtors' financial projections provided to GB Partners in July 2014, resulting in the Debtors' adjusted EBITDA being approximately 75% below forecasted levels. With the low price of coal expected to continue for the foreseeable future, absent significant changes to many of their existing contracts, the Debtors will continue to be unable to meet their debt obligations. Additionally, the Debtors have experienced losses of employees holding key financial positions, with the resignation of their Controller during their efforts to restructure out of Court as well as the retention of a new Chief Financial Officer for only a four month period. These employee turnover issues, combined with the impact of lower demands of and competitive alternatives to coal, have had a direct impact on the Debtors' sustainability.

24.     Because of the negative factors described above, the Debtors have been unable to obtain additional funding from their existing secured lenders or equity holders.  With existing trends in the coal industry, obtaining additional funding from sources other than the Debtors' existing lenders is highly unlikely.

25.     In order to maximize the value of the Debtors' assets for the benefit of all stakeholders, the Debtors have retained Energy Ventures Analysis, Inc. ("**EVA**") as their investment bankers to pursue strategic alternatives, including a sale of substantially all of the assets of the Debtors as part of this Chapter 11 Case.  Accordingly, the Debtors are filing a motion seeking to sell substantially all of their assets through an open auction process with a stalking horse bidder under section 363 of the Bankruptcy Code, which sale and bid procedures motion the Debtors do not seek to be heard as a First Day Motion.  The Debtors contemplate a sale process that will conclude in approximately forty-five (45) days.

### III.     FIRST DAY MOTIONS AND APPLICATIONS

26.     I have reviewed each of the First Day Motions, and I believe that the relief sought in each of the First Day Motions is critical and necessary to the Debtor's efforts to be successful in this chapter 11 case and to maximize the value of the Debtors' assets for the benefit of their creditors and their estates.   An overview of and support for each of the Debtors' First Day Motions is below.

**A.      Emergency Motion of Debtors for Entry of an Order (A) Scheduling an Expedited Hearing on First Day Motions and Application Filed by the Debtor and (B) Approving the Form and Manner of Notice Thereof ("Expedited Hearing Motion")**

27.     The Debtors request entry of an order, among other things, convening expedited hearings on certain First Day Motions and approving the form and manner of notice thereof.

28.     I believe that the First Day Motions involve matters that require emergency and expedited hearings.  As set forth in detail in each of the First Day Motions, the relief requested in the First Day Motions is essential to the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' chapter 11 estates, assists in ensuring that the Debtors satisfy their current obligations, and assists in the administration of the chapter 11 cases in an

8

efficient manner.  I understand that the First Day Motions are of the type heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations, its transition into chapter 11 and the proposed section 363 sale process.  Accordingly, the Debtors request a hearing on each of the First Day Motions on an expedited basis. Although the Debtors seek the scheduling of a hearing on the First Day Motions as soon as practical after the Petition Date, and therefore, without notice, prior to or immediately upon the filing of its chapter 11 petition the Debtors provided electronic or hard copies, via overnight mail, postage prepaid, of the First Day Motions to (i) the Office of the United States Trustee for the Eastern District of Kentucky; (ii) the Debtors' 20 largest unsecured creditors on a consolidated basis; (iii) GB Credit Partners, LLC; (iv) counsel for GB Credit Partners, LLC; (v) Bayside JW Resources, LLC; (vi) counsel for Bayside JW Resources, LLC; (vii) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e., GB Credit Partners, LLC, Bayside JW Resources, LLC, Bill Miller Equipment Sales, Inc., and Komatsu Financial Limited Partnership; (viii) all parties to equipment leases with the Debtors to the extent reasonably known to the Debtors; (ix) all parties asserting a surety bond interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e., Smith Manus Surety Bonds, Commonwealth of Kentucky, Energy and Environment Cabinet, Department of Natural Resources, Commonwealth of Kentucky, Energy and Environment Cabinet, Division of Mine Reclamation and Enforcement, Kentucky Utilities, Cumberland Valley Electric, Inc., United States of America, Department of the Interior, Bureau of Land Management, Bond Safeguard Insurance Co., and Lexon Surety Group; (x) all parties asserting a taxing interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e. Kentucky Department of Revenue, Kentucky Workers Compensation Fund,

Kentucky Department of Natural Resources, Tennessee Department of Revenue, US Department of Treasury, and US Department of Interior-Office of Surface Mining; (xi) counsel to any party in pending litigation with the Debtors; and (xii) those entities specifically affected by a specific motion.

29.     Accordingly, I believe that the First Day Motions involve matters that require an expedited hearing and respectfully request that this Court schedule such hearing as requested in the Expedited Hearing Motion.

**B.     Motion for Entry of an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors Chapter 11 Cases.  ("Joint Administration Motion")**

33.     The Debtors submit that their Chapter 11 cases should be administered jointly because the business operations and organization of the Debtors are closely related.  Each of the Debtors other than JW Resources is a direct wholly-owned subsidiary of JW Resources.  In addition to common-ownership ties, each of the Debtors is directly related to the operation of Straight Creek and Red Bird.

34.     As a result of the commonalities between these Debtors, many of the motions, hearings and orders that will arise in these Chapter 11 cases will jointly affect each and every Debtor.  By jointly administering the Debtors' Chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these chapter 11 cases and ease the onerous administrative burden of having to file multiple documents, thereby saving time, labor and expense for the Debtors and this Court.  Finally, supervision of the administrative aspects of the Chapter 11 cases by the Office of the United States Trustee will be simplified.  Further, the rights of the Debtors' respective creditors will not be adversely affected by the joint administration of these Chapter 11 cases.

35.     Accordingly, I believe that joint administration of these Chapter 11 cases is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**C.     Motion of Debtors for First Day Motions and all Subsequent Motions to be Heard in Lexington Division (the "Venue Motion")**

36.     Pursuant to the Venue Motion, the Debtor requests that the Court enter an Order providing that all hearings in this Case be heard in the Lexington Division of this Court.

37.     In this case, many of the parties who will need to attend hearings are either located in Lexington, Kentucky or will be travelling from outside the state of Kentucky to attend hearings.  These include the following:

(i)     The Debtors' counsel, Frost Brown Todd LLC, maintains offices in Lexington, Kentucky.

(ii)     Upon information and belief, many of the Debtors' creditors have or will retain counsel in Lexington, Kentucky.

(iii)     The U.S. Trustee's main office for this Court is located in Lexington.

38.     Accordingly, I believe that a change of venue to the Lexington Division cases is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**D.     Debtors' Expedited First Day Motion for Use of Cash Collateral and Debtors-in-Possession Financing**

39.     As discussed in more detail above, the Debtors are party to the Straight Creek Bayside Loans and the GB Loans (collectively, the "**Prepetition Obligations**").  The collateral for the Prepetition Obligations consists of a lien on substantially all of the Debtors' assets, including an interest in the cash proceeds generated from collections of the Debtors' accounts receivable (the "**Cash Collateral**").  Pursuant to the Cash Collateral & DIP Financing Motion, the Debtors seek authority to use the Cash Collateral in accordance with the Interim Budget,

attached as an exhibit to said Motion, to pay actual, necessary, ordinary course operating expenses.  This use of the Cash collateral is essential to maintain and maximize the value of the Debtors' assets during the pendency of this Chapter 11 case for the benefit of all creditors.

40.    Pursuant to the Cash Collateral & DIP Financing Motion, the Debtors seek the authority to (i) obtain cash advances and other extensions of credit on a secured basis  in the aggregate principal amount of $2.0 million (the **"DIP Facility"**), pursuant to a certain agreement to obtain Debtor in Possession Credit (the **"DIP Credit Agreement"**) between the Debtor and the DIP Agent and DIP Lenders; (ii) grant security interests and superpriority claims, and (iii) grant adequate protection, all pursuant to the terms of the proposed Interim Order attached thereto.

41.    I believe that, under the current circumstances, the postpetition financing proposal made by the DIP Lenders satisfies the Debtors' financing needs and establishes necessary support at the outset of this case to permit the Debtors time to seek to maximize the value of the estate for the benefit of all creditors.

42.    Before deciding to enter into the DIP Credit Agreement, the Debtors and the DIP Lenders engaged in arms' length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.  I believe that based on the totality of circumstances, the Debtors were unable to obtain proposals for postpetition financing on terms and conditions more favorable to the Debtors' estate than those set forth in the DIP Credit Agreement.

43.    Unless the Debtor is authorized to obtain the financing requested herein, the Debtors face significant risks that its primary vendors will no longer do business with the

Debtors, employees will have added concern with respect to their job security, and customers may turn to competitors.

44.      I believe the Debtors are unable to obtain credit that is not both secured and entitled to what counsel has explained to me as superpriority administrative claim status under the Bankruptcy Code from any other financing source due, in part, to the challenge of priming the GB Loans as set forth in the Intercreditor Agreement.  Under the Debtors' circumstances, and given the Debtors' current financial status, I believe that no lender would provide financing to the Debtors other than on a secured and superpriority basis.  Given the Debtors' economic standing, and in particular, the Debtors' significant liquidity crisis, the Debtors were only able to pursue postpetition financing arrangements with the DIP Lenders.  I have been informed by counsel that this satisfies the conditions for section 364(c) of the Bankruptcy Code.  Thus, I believe that the financing arrangement proposed under the DIP Credit Agreement represents the best available to the Debtors at this time.

45.      I believe and understand that the terms of the DIP Credit Agreements and Interim Order are fair, just, and reasonable under the circumstances, as ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Credit Agreement and the Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Lenders, with all parties represented by counsel.  Accordingly, the Debtors believe that any credit extended under the terms of the Interim Order is extended in good faith by DIP Lenders as that term is used in section 364(e) of the Bankruptcy Code.

46.     I believe that the Debtor's inability to utilize the funds made available pursuant to the DIP Credit Agreement will immediately create substantial issues with the Debtors' ability to move forward with a proposed sale of substantially all of the Debtors' assets to maximize value for the Debtors' estates.  The funding provided by the DIP Credit Agreement will make it possible for the Debtors to maintain their businesses for a going concern sale while simultaneously meeting their reclamation requirements, maintain the value of their equipment and existing infrastructure, maintain required bonds, post necessary bond premiums and transition the businesses to the successful bidder(s).  Without this funding, I believe the value of the Debtors' going concern operations would plummet.  Accordingly, I believe the only way to protect the value of the prepetition assets to the fullest extent possible is for the Debtors to obtain the debtor in possession financing provided by the DIP Facility.

**47.**     Therefore, I believe that it is in the exercise of the respective best interest and reasonable business judgment of the Debtors, that the financing to be provided by the DIP Lenders is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs while they reorganize their businesses

**E.**     **Motion of the Debtors for Entry of Interim and Final Orders (i) Approving Continued Use of Cash Management System (ii) Authorizing use of Prepetition Bank Accounts and Business Forms, (iii) Waiving Certain Requirements of the United States Trustee, and (iv) Waiving the Requirements of 11 U.S.C. § 345(B)**

48.     By the above-captioned Cash Management Motion, the Debtors seek entry of an order:  (a) authorizing the continued use of the Debtors' existing centralized cash management system (the "**Cash Management System**") and (b) authorizing maintenance of the Debtors' existing checks, bank accounts, and business forms.  The Debtors seek authorization to ensure their orderly entry into bankruptcy and to help efficiently administer their business and avoid the

14

disruptions and distractions that would inevitably divert the Debtors' attention from urgent matters during the initial stages of their chapter 11 bankruptcy case.

### (i)        The Cash Management System

49.        The Debtor maintains six (6) bank accounts (the "**Bank Accounts**") at Wells Fargo and Fifth Third Bank (collectively, the "**Banks**") in the ordinary course of business.  Four (4) of the Bank Accounts formerly served as payroll accounts and operating accounts.  Two (2) of the Bank Accounts serve as disbursement accounts.  A true and correct list of the Bank Accounts, including the Banks, each Bank's address and the last four digits of the account numbers is attached to the Cash Management Motion as Exhibit A.

50.        The Cash Management System is an integrated system that provides well-established mechanisms for the collection, distribution, movement and management of funds used in the Debtors' business operations.  The flow of cash begins with cash generated as a result of the Debtors' coal mining operations in Eastern Kentucky.  The Debtors' cash management reporting and account functions are systematic and include the necessary accounting controls to enable the Debtors to trace funds.  The Debtors maintain necessary records for their Cash Management System that identify the current balance of the Bank Accounts.  The Debtors are also able to determine the amount of funds deposited into or withdrawn from the Bank Accounts by the Debtors and will track the expenses that are satisfied.

51.        Accordingly, I believe the ability to maintain the current Cash Management System is necessary to avoid disruption of the ongoing business operations and the relief as requested in the Cash Management Motion should be granted.

### (ii)        Existing Bank Accounts and Business Forms

15

52.    The Debtors seek a waiver of the UST requirement that its Bank Accounts be closed and that new postpetition bank accounts be opened.  If enforced in this case, the UST requirements would cause enormous disruption in the Debtors' businesses and would impair the Debtors' chapter 11 efforts.  As described above, the Debtors' Bank Accounts comprise a cash management system that the Debtors must maintain in order to ensure efficient collections and disbursements in the ordinary course of its business.  Therefore, to avoid delays in paying debts incurred post-petition, and to ensure a smooth transition into chapter 11, the Debtors should be permitted to continue to maintain the Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

53.    Additionally, the Debtors seek a waiver of the UST requirement that disbursements be made by numbered check.  The Debtors sometimes disburse funds by, among other avenues, debits, wire transfers, and by initiating automated clearing house transfers.  To the extent any such transfers are done in the ordinary course of the Debtors' businesses, the Debtors seek permission to continue such transfers.  The Debtors will ensure that procedures are in place to track each transfer of funds.

54.    I believe it is critical to the continued operation of the Debtors' businesses and the preservation of the value of its assets that the existing Cash Management System and Bank Accounts, and in particular, the disbursement Bank Accounts with Well Fargo, continue to be utilized without disruption.

55.    In addition, the Debtors' pre-printed correspondence, business forms, letterhead and checks are all customized according to its ordinary business needs.  Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtors' business operations.  Parties doing business with the

Debtors undoubtedly will be aware of the Debtors' status as debtor in possession and brand new correspondence and business forms would be unneeded.  Accordingly, the Debtors also request authority to (i) continue using its correspondence and business forms to the extent that the Debtors shall manually alter and/or modify said forms with the debtor-in-possession designation and (ii) delay the purchase and/or obtaining of new correspondence and business forms with the debtor-in-possession designation until the existing correspondence and business forms have been completely used.

56.     Finally, the Debtors are requesting that this Court waive the requirements of section 345(b) of the Bankruptcy Code and permit them to maintain their deposits in their accounts in accordance with the existing deposit practices.  Given the design and use of the Debtors' Cash Management System and the security of the Cash Management System, the Debtors submit that cause exists to grant a waiver of the requirements of section 345(b) of the Bankruptcy Code.  Requiring the Debtors to change deposits and other procedures could result in harm to the Debtors, their estates and creditors because it would disrupt the Debtors' existing Cash Management System.

57.     Accordingly, I believe approval of the Cash Management Motion is in the best interest of the Debtors, their estates, and parties-in-interest.

**F.**     **Motion of the Debtors for Entry of an Order under 11 U.S.C. §§ 105(A) and 366 (i) Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, (ii) Establishing Procedures for Determining Adequate Assurances of Payment, and (iii) Establishing Procedures for Utilities to Opt Out of the Debtors' Proposed Procedures for Adequate Assurance (the "Utilities Motion")**

58.     In the operation of their business, the Debtors purchase utility services from various providers (the "**Utility Providers**") for, among other things, electricity, water, telephone,

and internet in the ordinary course of business (the "**Utility Services**").  Attached as <u>Exhibit A</u> to

the Utilities Motion is a nonexclusive list of substantially all of the Utility Companies that were

providing Utility Services to the Debtors as of the Petition Date.  Based on the historical average

over the last twelve months, the Debtors spend approximately $64,289.00 each month on utility

costs.  As of the Petition Date, approximately $25,000.00 in utility costs were outstanding

59.     Uninterrupted utility services are essential to the Debtors' ongoing business

operations and, therefore, to the success of its chapter 11 efforts.  Should the Utility Providers

refuse or discontinue service to the Debtors, even for a brief period, the Debtors' business

operations would be severely disrupted and/or damaged.

60.     Continuity of services is particularly critical in this case because the Debtors rely

on various utilities, particularly, electricity and water, for continued operation at its facility.

Failure to maintain continuously operating facilities will inevitably harm the Debtors' business

operations.  Indeed, an interruption of utility services would negatively impact the Debtors'

business operations, revenue, and profits, seriously jeopardizing the Debtors chapter 11 efforts.

It is, therefore, critical that utility services continue uninterrupted.

61.     The Debtors fully intend to pay all postpetition obligations owed to the Utility

Providers in a timely manner.  The Debtors expect that cash collateral and borrowings under the

Debtors' proposed Debtors-in-possession financing facility will be more than sufficient to pay

the Debtors' postpetition obligations, including all postpetition utility obligations.

62.     Nevertheless, the Debtors intend to provide adequate assurance of payment for

future services to their Utility Providers, and the Debtors propose to make a deposit of $35,000

(the "**Utility Deposit**"), representing a deposit equal to two weeks of utility service, into a newly

created, segregated, interest-bearing account within 5 days of the Petition Date (the "**Utility**

**Deposit Account**"). This amount is based on the historic average over the past 12 months, from each Utility Provider listed on the Utility Service List.

63.    The Debtors submit that the Utility Deposit, in conjunction with existing security deposits and the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.

64.    In light of the severe consequences to the Debtors of any interruption in Utility Services, but recognizing the right of Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtors are proposing procedures in the Utilities Motion that will enable the Debtors to cooperatively work with the Utility Providers in a coordinated manner to consensually resolve adequate assurance issues. If any Utility Provider believes additional assurance is required and any issues cannot be consensually resolved, they may request such assurance pursuant to the procedures set forth in the Utilities Motion.

65.    I believe the proposed Adequate Assurance and related procedures set forth in the Utilities Motion is sufficient to provide the Utility Providers with adequate assurance of payment. I further believe that the relief requested in the Utilities Motion and the proposed procedures set forth therein are necessary for the Debtors to carry out their efforts in these chapter 11 cases. If this Court does not approve the proposed procedures, the Debtors could be forced to address numerous requests by its Utility Providers in a disorganized manner at a critical point during these chapter 11 cases. Moreover, discontinuation of service would essentially put an immediate halt to the Debtors' operations, putting the Debtors' efforts in these chapter 11 cases in extreme jeopardy.

66.     Lastly, the Debtors have made an extensive and good faith effort to identify their Utility Providers and include them on the utility service list.  Nonetheless, it is possible that the Debtors have not yet identified or included certain Utility Providers on said service list.  To the extent that the Debtors identify additional Utility Providers, the Debtors will file amendments to the Utility Service List, and shall serve copies of the Order on such newly identified Utility Providers.  The Debtors request that the order be binding on all Utility Providers, regardless of when such Utility Provider was added to the utility service list.

67.     Accordingly, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estate, its creditors and other parties in interest.

G.      **Motion for Interim and Final Order Authorizing Payment of Certain Prepetition Taxes and Directing all Banks to Honor Prepetition Checks for Payment of Prepetition Sales, Use, and Production Tax Obligations**

68.     Under the Tax Payments Motion, the Debtors seek entry of an order pursuant to section 105 of the Bankruptcy Code authorizing, but not requiring, the Debtors to remit and pay certain taxes, to the appropriate taxing authorities (the "**Governmental Authorities**") in the ordinary course of business, on an unaccelerated basis, as payments become due and payable. To the extent that a check issued prior to the Petition Date has not cleared the bank as of the Petition Date, the Debtors also seek entry of an order authorizing the Debtors' banks to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Taxes.

69.     In connection with the normal operation of business, the Debtors collect, withhold, incur and pay: (i) Production Taxes, (ii) Coal Excise Taxes, (iii) Environmental and Safety Fees and Assessments, (iv) Use Taxes, (v) Franchise Taxes and Fees, (vi) Unmined Minerals Taxes and other Property Taxes, and (vii) Other Taxes.  The Debtors pay the Taxes to

the various Governmental Authorities on a monthly, quarterly or yearly basis, depending on the particular Tax, as such payments become due and payable.

70.     On a periodic basis, the Debtors pay to the Taxing Authorities by funds drawn by check or by means of an electronic funds transfer.

71.     As of the Petition Date, the Debtors' financial records indicate that the Debtors are current on some of their payment of Taxes, and delinquent on others, to the Taxing Authorities.

72.     I believe that many of the Taxes collected prepetition are not property of the Debtors' estates and must for that reason be turned over to the Governmental Authorities. To the extent that they are not actually the property of the Governmental Authorities, they may well give rise to priority claims. Moreover, the Debtors also seek to pay Taxes in order to forestall the Governmental Authorities from taking actions that might interfere with the Debtors' businesses, such as blocking the receipt or renewal of permits required for the Debtors' continued operations or possibly bringing personal liability actions against directors, officers and other employees in connection with non-payment of the Taxes. Actions against the Debtors' directors, officers and other employees would likely distract key personnel, whose full-time attention to these chapter 11 cases is required, and would likely cause potential business disruptions. Any such business disruptions would likely erode the Debtors' customer base and negatively affect these chapter 11 cases.

73.     In addition, I am informed by counsel that the Taxes may be afforded priority status under section 507(a)(8) of the Bankruptcy Code, and therefore, such taxes and fees must be paid in full as a condition to confirmation of any plan of reorganization. Accordingly, the payment of the taxes and fees affects the timing of the payment and should not prejudice the

rights of other creditors or reduce the ultimate distribution to such creditors. Further, to the extent that the Debtors have collected sales and use taxes from their customers and such funds must be held in trust by the Debtors for the benefit of the Taxing Authorities, such monies may not constitute property of the Debtors' estate.

74.     Accordingly, I respectfully submit that the payment of the taxes and fees is necessary for the continued operation of the Debtors' business.

**H.      Motion of the Debtors for Interim and Final Orders (i) Authorizing, but not Directing, the Debtors to (A) Pay and Honor Certain Prepetition Claims for Wages, Salaries, Bonuses and Other Compensation and Withholdings and Deductions; (B) Continue employee Benefit Programs in the Ordinary Course of Business; and (C) Pay Certain Reimbursable Expenses; (ii) Authorizing, but not Directing, the Debtor to Make Deductions from Employee Paychecks, and (iii) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay all Checks and Electronic Payment Requests Made by The Debtors Relating to the Foregoing (the "Wage Motion").[2]**

**(I)      Employee Obligations**

**(i)      Unpaid Compensation**

75.     Prior to the Petition Date, the Debtors employed approximately eighty-five (85) employees, most of whom were terminated prior to the Petition Date, with a small number remaining employed post-Petition Date (collectively, the "**Employees**").

76.     The Employees were or are paid on a bi-weekly basis (the "**Pay Period**"), which runs from Sunday to Saturday and is paid on the Friday following the end of the Pay Period. The payroll is made primarily by check.

---

[2] Many of the amounts referenced as applying to the Wage Motion include amounts that applied to the Debtors on a monthly basis before the pre-Petition Date termination of much of the Debtors' workforce.  The Debtors seek to pay pre-Petition Date amounts earned by former Employees, such that the amounts set forth in this First Day Declaration have not been adjusted for post-Petition Date amounts and may not be accurate.  All amounts proposed to be paid will be set forth in the Debtors' budget to be filed with the Court.

77.     As of the Petition Date, the Debtors had not paid their Employees all prepetition wages and compensation may be due and owing because, among other things, there may have been variations in the Debtors' payroll records and the Employees checks may not have cleared financial institutions.

78.     The Debtors are seeking authority to pay amounts owed to Employees and estimate that, as of the Petition Date, approximately $118,000 will be outstanding, which consists of accrued wages, salaries, overtime pay and other compensation earned prior to the Petition Date.  The Employees, even those who were terminated prior to the Petition Date, have provided valuable services to the Debtors, much of which should be realized post-petition, and for which the Employees should be compensated consistent with the work they performed pre-Petition Date.

79.     As set forth in the Wages and Benefits Motion, I believe that the Debtors must have authority to pay or otherwise satisfy the amounts owing to Employees for wages.  The amounts to be paid to or for the benefit of the Employees are reasonable, considering their importance and necessity to the Debtors' business post-Petition Date.

**(ii)      Remitting and Paying Appropriate Deductions and Withholdings**

80.     The Debtors deduct certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support and similar deductions, (b) other pretax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) contributions, 401(k) loan payments, legally ordered deductions and other miscellaneous deductions), and (c) deductions for individual insurance programs selected by the Employees such as voluntary life

insurance (collectively, the "**Deductions**"). On average, each month, the Deductions total approximately $30,000.00 for Employees.

81.     Further, the Debtors are required by law to withhold from its Employees' wages amounts related to federal, state, and local taxing authorities, (the "**Withheld Amounts**"). On average, the Withheld Amounts total approximately $110,000 per month for Employees.  The Debtors must also match from its own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, and additional amounts for state and federal unemployment insurance (the "**Employer Payroll Taxes**" and together with the Withheld Amounts, the "**Payroll Taxes**").   The Employer Payroll Taxes are equal to approximately $20,000.00 each month.

82.     Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and reserved for the Employer Payroll Taxes. However, due to the commencement of these chapter 11 cases, the Payroll Taxes may not have been forwarded to the appropriate taxing authority. As a result, the Debtors seek authority, at their discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

**(iii)     Honoring Reimbursable Expenses**

83.     Prior to the Petition Date, and in the ordinary course of business, employees incurred certain expenses on the Debtors' behalf, which include but are not limited to, meals, parking, automobile mileage and other business related expenses (the "**Reimbursable Expenses**").  Employees use their personal funds to pay for the Reimbursable Expenses, and submit check requests to their supervisor who reviews and approves the requests and then

24

forwards them to accounting for payment from corporate funds.  Reimbursable Expenses average approximately $3,000 in the aggregate per month.

84.    Additionally, two of the Debtors employees are issued company paid credit cards through American Express (the "**Company Credit Card Program**") for expenditures that include, but are not limited to, expenses for business related meals, parking, lodging, and other business-related expenses incurred by the Employees in the scope of their employment. Upon proper approval the Debtors pay American Express approximately $5,000 per month.

85.    To the extent any Employees incurred the Reimbursable Expenses, such expenses were incurred on the Debtors' behalf and in the scope of their employment, with the understanding that such expenses would be paid by the Debtors.  Accordingly, the Debtors request authority, in their sole discretion, to (a) continue to honor, in the ordinary course of business, the outstanding checks for Reimbursable Expenses current Employees, (b) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (c) modify their prepetition policies relating thereto as they deems appropriate and (d) pay all Reimbursable Expenses or amounts arising from the Company Credit Card Program that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period.

**(II)    Employee Benefits**

85.    The Debtors provide Employees, in the ordinary course of business, with a number of Employee Benefits designed to assist the Employees and the Employees' eligible dependents.  These Employee Benefits include, but are not limited to:  (a) medical, dental and vision insurance; (b) workers' compensation insurance; (c) vacation time and other paid absences; (d) 401(k) plan; and (e) other miscellaneous benefits.  The Debtors seek authorization,

but not discretion, to pay or otherwise continue to honor these Employee Benefits, as described herein.

### (i)    Health Benefits

86.    The Debtors provide certain Employee who qualify with medical, dental and vision insurance.  The medical insurance is provided by Blue Cross.  The dental and vision insurance is provided by Guardian.  Together, the Medical Plan, the Dental Plan, and the Vision Plan are the "**Health Benefits**." On a monthly basis, the Debtors, with contributions from the Employees, fund the Health Benefits.

87.    The average monthly cost of the Health Benefits is $151,000 per month, which consists of employee contributions, employer contributions (only for the Medical Plan) and certain administrative expenses related thereto.

88.    Furthermore, and for similar reasons, the Debtors seek to continue to provide continuation coverage under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("**COBRA**") (see 26 U.S.C. § 4980B).  The premiums for the COBRA coverage are paid by the Debtors.  The Debtors pay approximately $1,000 per year to McGregor & Associates, Inc. to administer the COBRA Coverage.  On a monthly basis, the Debtors collect approximately $1,600 from Qualified Cobra Beneficiaries.

89.    By the Wages and Benefits Motion, the Debtors seek authority, in its sole discretion to: (a) continue the Health Benefits, including the COBRA Coverage, for the Employees and/or Qualified COBRA Beneficiaries in the ordinary course of business on a postpetition basis, (b) modify their prepetition policies relating thereto as they deem appropriate, without further approval of this Court, (c) continue making the above-described contributions to such Health Benefits programs, (d) continue to pay fees of third-party administrators as

necessary and (e) pay any amounts related thereto, including any premiums and claim amounts that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period.

(ii)    <b>Workers' Compensation</b>

90.    Pursuant to applicable state laws, the Debtors must maintain workers' compensation liability coverage (the "**Workers' Compensation Programs**") in the ordinary course of business to ensure prompt and efficient payment and/or reimbursement to their Employees for workers' compensation claims.

91.    The Debtors obtain workers' compensation coverage through Brickstreet Mutual Insurance Company.   The Debtor's pay approximately $525,000 annually for workers' compensation coverage.   Monthly installment payments are approximately $45,000 per month (the "**Workers' Compensation Premium**").   In addition, the Debtors pay approximately $5,000 per quarter to the Workers' Compensation Funding Commission as required by law.

92.    Certain benefits under the Workers' Compensation Programs may have been awarded prepetition, but have yet to be fully paid by the Debtors.   Certain other claims were filed prepetition, but have yet to be resolved.   In order for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with state law requirements, claim assessment, determination and adjudication must continue.   The costs associated with the Workers' Compensation Programs may fluctuate according to the various claims submitted in a given year.  The Debtors estimate that approximately $0 is owed as of the Petition Date.

93.    By the Wages and Benefits Motion, the Debtors request authority to (a) continue to maintain their Workers' Compensation Programs in the ordinary course of business, including payment of third-party administrators' fees, state fund fees and insurance premiums (b) modify their prepetition policies relating thereto as the Debtors deem appropriate, without further

approval of this Court, and (c) pay any amounts related thereto that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period.

### (iii)    Vacation, Holiday and Paid Leave

94.    Vacation Time.  The Debtors provide vacation time to all Employees ("**Vacation Time**").  Vacation Time for Employees is accrued after six (6) months of continuous full-time employment, and when used, Employees are paid for eight (8) hours at regular rates.   Any vacation time not utilized within one (1) year of the date earned is forfeited by the Employee.

95.    Holiday Pay. The Debtors provide regular full time Employees eight (8) paid holidays ("**Holiday Pay**") per year. If a holiday falls on a weekend, Employees receive either the Friday before or the Monday following the holiday as an additional paid vacation day.  Holiday Pay is paid at an Employees regular rate.

96.    Special Leave. The Debtors provide regular full time Employees, who are called for jury duty, with pay for serving as a jury member ("**Jury Duty Leave**").  Jury Duty Leave is intended to make up the difference between any lesser amount a participating Employee receives as a jury member and the Employee's regular earnings.

97.    By the Wages and Benefits Motion, the Debtors seek Court approval to, among other things, (a) continue to honor their Vacation Time, Holiday Pay and Jury Duty Leave policies in the ordinary course of business, (b) modify their prepetition policies relating thereto as they deem appropriate and (c) honor and pay any obligations related thereto that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period.  The Debtors do not seek the authority to pay, nor will the Debtors pay, any lump-sum payments of unused vacation time during the pendency of these chapter 11 cases.

### (iv)    401(K) Savings Plan

98.     The Debtors sponsor a 401(k) Plan for the Employees that is administered by Transamerica Retirement Solutions.  Substantially all of the Debtors' Employees are eligible to participate in the 401(k) Plan.  The Employees' contributions to the 401(k) Savings Plan total approximately $2,500 per Pay Period.  Currently the Debtors estimate that there is approximately $1,250 of accrued but unpaid prepetition liabilities pertaining to the Employees' contributions to the 401(k) Savings Plan.

99.     By the Wages and Benefits Motion, the Debtors request to continue the 401(k) Plan for Employees, in its sole discretion, and in the ordinary course of business and to remit and contribute any prepetition amounts withheld thereunder.

        (v)     **Employee Insurance Benefits**

                (a)     **Basic Life Insurance, Supplemental Life Insurance, and Short and Long Term Disability Benefit Program**

100.    The Debtors provide basic group term life insurance coverage ("**Basic Life Insurance**") to all full-time Employees through Colonial Life.  All costs of the Basic Life Insurance are borne exclusively by the Debtor and the average aggregate annual cost to Employees amounts to approximately $5,800.

101.    Full-time Employees are also eligible to purchase supplemental life insurance (the "**Supplemental Life Insurance**", and, collectively with the Basic Life Insurance the "**Life Insurance**"), for which the Employees pay all the premiums.  Some full-time employees have selected to participate in the Supplemental Life Insurance program through Colonial Life.  All costs of the Supplemental Life Insurance are borne exclusively by the Employee participants; however, these payments are made through payroll deductions, with the Debtors remitting the amounts owed directly to Colonial Life.  Consequently, there may be accrued and outstanding

amounts withheld from the Employees that have not yet been paid to Colonial Life.  The average aggregate annual cost to Employees amounts to approximately $2,500.

102.    The Debtors provide certain Employees benefits for cancer, accident and juvenile life insurance (the "**Other Insurance Benefits**") through Colonial Life, each in accordance with the Debtors' benefits policies.   The Other Insurance Benefits are paid exclusively by the Employees.

103.    By the Wages and Benefits Motion, the Debtors seek, out of an abundance of caution, authority, in its discretion, to (a) continue to provide the Employee Insurance Benefits, including payment of third-party administrators' fees, (b) modify their prepetition policies relating thereto, as they deems appropriate, without approval of this Court, (c) to pay any amounts relating thereto that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period and (d) to remit any prepetition amounts withheld thereunder.

### (III)    Independent Contractors

104.    The Debtors' have obligations to the Independent Contractors including monthly in compensation, plus any business related expenses incurred (collectively, the "**Contractor Obligations**").   The Independent Contractors are not employees of the Debtors and do not receive Employee Benefits and Wages.

105.    By the Wages and Benefits Motion, the Debtor seek authority, in their discretion, to (a) continue to honor their Contractor Obligations in the ordinary course of business, (b) modify their prepetition policies relating thereto, as they deem appropriate, without approval of this Court, and (c) to pay any amounts relating thereto that (i) accrued prepetition and (ii) accrued postpetition but relate to the prepetition period.

### (III)    Direction to Banks

30

106.     Finally, the Debtors seek an Order authorizing and directing all banks to receive, process, honor and pay any checks, direct deposits, and/or wire transfers drawn upon the Debtors' payroll and general disbursement accounts related to Employee Wages and Benefits, whether presented before or after the Petition Date, provided that such funds are on deposit in the applicable amounts to cover such payments.

107.     The Debtors believe that payment of the amounts requested in the Wages and Benefits Motion for all Employees, the continuation of the vast majority of the Employee Wages and Benefits and honoring the Contractor Obligations on a post-petition basis for any Employees remaining post-Petition Date, is in the best interests of all parties and is the right thing to do.

108.     Accordingly, I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**I.     Motion of the Debtors for Entry of Interim and Final Orders Authorizing Debtors to Continue and Renew their Surety Bond Programs**

119.     The Debtors seek entry of an order authorizing the Debtors to maintain, continue and renew, in their sole discretion, their Surety Bond Program on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of cash collateral, as were in effect before the Petition Date. This authority would include permitting the Debtors (i) to pay all amounts arising under the Surety Bond Program due and payable after the Petition Date and (ii) to renew or obtain new surety bonds as needed in the ordinary course of business, including, but not limited to, as may be required by law or judicial authority.

120.     If the requested relief is not granted and the Surety Bond Program lapses or terminates, the Debtors' operations could be severely affected, thereby endangering the Debtors'

successful reorganization and substantially harming all creditors.  I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.

**J.**      **Debtors' Expedited Motion for Entry of an Order Authorizing, but not Directing, the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and (B) Maintain Postpetition Financing of Insurance Premiums**

109.    The Debtors seek entry of an order authorizing the Debtors to (a) continue pre-petition insurance policies and programs by making monthly premium payments and (b) maintain the premium financing agreement with First Insurance Funding Corp for insurance coverage entered into pre-petition.

110.    In the ordinary course of business, the Debtors entered into numerous insurance policies that provide coverage for the Debtors.  Collectively, these policies provide coverage for, among other things, property and equipment damage, business interruption, commercial general liability, business automobile liability, pollution liability, umbrella liability, directors and officers liability, fiduciary liability, crime, and personal property.

111.    Some of the Debtors' insurance policies require payment of the entire applicable premium at the inception of the applicable coverage period ("**Financed Policies**"); however, it is not always in the Debtors' best interest to pay their full insurance premiums up front. Accordingly, in the ordinary course of business, the Debtors finance the premiums on the Financed Policies pursuant to a premium financing agreement (the "**Financing Agreement**"). The Financing Agreement benefits the Debtors by spreading out the cost of the Financed Policies' premiums over the term of the respective coverage period.

112.    The total amount financed under the Financing Agreement, for the policy period of February 1, 2015 through February 1, 2016 is approximately $379,374.73 and carries a 5.74% interest rate resulting in a finance charge of approximately $10,052.17.  The Debtors agreed to make ten monthly payments of $38,942.69.

113.    As of the Petition Date, the Debtors are current with their payments to First Insurance Funding Corp. on account Debtors' obligations under the Financing Agreement.

114.    I believe that maintaining both the Monthly Policies and the Financed Policies and making payments pursuant to the Financing Agreement are in the Debtors' estates, creditors', and other parties in interest's best interests and are necessary to maintain the Debtors' operations.

K.    **Application To Retain, Employ and Compensate Frost Brown Todd LLC as Attorneys for the Debtors**

124.    By the above referenced FBT Retention Application, the Debtors seek to employ and retain the firm of Frost Brown Todd LLC as their counsel with regard to the filing and prosecution of these chapter 11 cases and all related matters, effective as of the Petition Date. Accordingly, the Debtors respectfully request entry of an order authorizing them to employ and retain Frost Brown Todd LLC as its general bankruptcy counsel to perform the legal services that will be necessary during these chapter 11 cases.

125.    Frost Brown Todd LLC is well qualified to represent the Debtors.  In preparing for these chapter 11 cases, Frost Brown Todd LLC has become familiar with the Debtors' business affairs and many of the potential legal issues that may arise in connection with these chapter 11 cases.  Frost Brown Todd LLC also has knowledge of the Debtors' business, financial affairs and capital structure.  In selecting Frost Brown Todd LLC as their general bankruptcy

counsel, the Debtors considered Frost Brown Todd LLC's knowledge of the Debtors' operations and finances and its expertise and experience in reorganization and bankruptcy law.

126.    I understand that Frost Brown Todd LLC has served as counsel to debtors and creditors in various bankruptcy cases.  In addition, the Frost Brown Todd LLC attorneys responsible for representing the Debtors in matters related to its reorganization are members of Frost Brown Todd LLC's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

127.    Frost Brown Todd LLC's depth of experience in business reorganizations and its familiarity with the Debtors makes Frost Brown Todd LLC uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtors' reorganization.  Therefore, the Debtors believe that Frost Brown Todd LLC is well qualified to serve as their bankruptcy counsel and that retention of Frost Brown Todd LLC is in the best interest of the estates.

128.    I believe that Frost Brown Todd LLC's services are necessary to enable and assist the Debtors in performing their duties as debtors-in-possession relating to the day-to-day operations of the Debtors as well as all bankruptcy specific matters.

129.    Accordingly, I respectfully submit that authorizing the Debtors to employ and retain Frost Brown Todd LLC as attorneys for the Debtors in these chapter 11 proceedings is necessary and in the best interest of the Debtors and their estates.

L.    **Application for an Order Authorizing the Employment, Retention, and Compensation of Energy Ventures Analysis, Inc, as Sale Advisor for the Debtors**

130.    By the EVA Application, the Debtors request entry of an order approving the retention of Energy Ventures Analysis ("**EVA**") as investment banker and sale advisor ("**Sale Advisor**") for the Debtors during these chapter 11 cases.

34

Case 15-60831-grs   Doc 31   Filed 07/06/15   Entered 07/06/15 16:07:13   Desc Main
Document    Page 35 of 36

131.    EVA is well qualified to represent the Debtors.  In preparing for these chapter 11 cases, EVA has worked with the Debtors and become familiar with the Debtors' business affairs, assets, and many of the potential financial and economic issues that may arise in connection with these chapter 11 cases.  EVA has also acquired knowledge of the Debtors' businesses, financial affairs and capital structure.  In selecting EVA as their Sale Advisor, the Debtors considered EVA's knowledge of the Debtors' operations and finances and EVA's expertise and experience in various energy industries, including the coal industry.

132.    I understand that EVA has served as a consultant for multiple companies, both in bankruptcy and non-bankruptcy situations.

133.    EVA's depth of experience in business reorganizations, mergers and acquisitions, asset sales, and financial management and its familiarity with the Debtors and the coal industry makes EVA uniquely qualified to deal effectively with the issues that may arise in the context of the Debtors' chapter 11 cases.  Therefore, the Debtors believe that EVA is well qualified to serve as the Debtors' Sale Advisor and that retention of EVA is in the best interests of the estates.

134.    I believe that EVA's services are necessary to enable and assist the Debtors in performing their duties as debtors and debtors-in-possession relating to the valuation, marketing and sale of the Debtors' assets.  Accordingly, I respectfully submit that authorizing the Debtors to employ and retain EVA is in the best interests of the Debtors and their estates..

## IV.  CONCLUSION

In order to preserve and maximize the value of their assets until the Debtors' assets can be sold pursuant to a sale process that has been approved by this Court, the Debtors' immediate goal is to maintain and maximize the value of their business operations in the ordinary course following the commencement of these chapter 11 cases.  I believe that, if the Court grants the

relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtors' estates, their creditors, and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 6th day of July, 2015.

By: _____

Joshua Porter