**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE:

JW RESOURCES, INC., *et al.*[1],  CASE NO. 15-60831

DEBTORS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Motion of Debtors for Order: (A) Approving Bid Procedures for the Sale of All or Substantially All of the Debtors' Assets (Excluding Mobile Equipment) and to Assume and Assign Certain of the Debtors' Executory Contracts and Unexpired Leases; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related thereto; and (C) Granting Related Relief [Doc. 94] ("Bid Procedures Motion") and the Debtors' Supplement to the Bid Procedures Motion [Doc. 203], as well as the Official Committee of Unsecured Creditors' Objection [Doc. 214] to same.

The Court held a hearing on the Bid Procedures Motion on August 20, 2015. After reviewing the record, considering arguments of counsel and testimony, and being otherwise sufficiently advised, the Court finds that the proposed break-up fees totaling $375,000.00 are supported by the Debtors' sound business judgment based on the circumstances herein. The Committee's Objection is overruled.

**I.   RELEVANT FACTS.**

The Debtors entered into two Asset Purchase Agreements with a proposed stalking horse bidder, contingent on bankruptcy court approval. *See* Asset Purchase Agreements [Doc. 210]. The Asset Purchase Agreements included provisions for break-up fees of $375,000.00

---

[1] The Debtors in these Chapter 11 cases are: JW Resources, Inc., Straight Creek Coal Mining, Inc., SCRB Properties, Inc., and SCRB Processing, Inc.

1

($300,000.00 for the sale of substantially all the assets and $75,000.00 for the sale of mobile equipment). *Id.* The Debtors seek to proceed with an auction of their assets to obtain higher bids or confirm the Asset Purchase Agreements provide the highest return for their assets.

The Committee raised several issues [Doc. 214], but ultimately pursued only one objection at the hearing. The Committee argues the break-up fees in the Asset Purchase Agreements are too high.

## II. DISCUSSION.

### A. There Are Many Standards Used to Evaluate Break-Up Fees.

Courts use several approaches in evaluating break-up fees. Some courts evaluate break-up fees based on the Debtors' business judgment. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992). *Integrated* used a three part test to analyze the Debtors' business judgment: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is unreasonable relative to the proposed purchase price. *Id.*

The bankruptcy court in *In re Hupp Industries, Inc.* used a seven part test to determine whether the break-up fee was in the best interest of the estate. 140 B.R. 191, 194-96 (Bankr. N.D. Ohio 1992). Another way to evaluate the reasonableness of the Debtor's business judgment is to compare the break-up fee to the total consideration paid. Fees in the range of 1% to 2% of the purchase price are often approved. *Matter of Tiara Motorcoach Corp.*, 212 B.R. 133, 138 n.6 (Bankr. N.D. Ind. 1997).

Another approach is to treat a break-up fee as an administrative claim. 11 U.S.C. § 503(b)(1)(A); *see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien*

*Envtl.Energy*, *Inc.)*, 181 F. 3d 527 (3rd Cir. 1999). Administrative fees are approved if they are actually necessary to preserve the value of the estate under the same test as all other administrative expense requests. *See id.* at 535; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010) (reaffirming that § 503(b) administrative expense treatment is the only appropriate standard for ruling on break-up fees).

The Fifth Circuit recently rejected the Third Circuit's reliance on administrative expense treatment as the only appropriate standard and affirmed the bankruptcy court's approval of break-up fees in advance of an auction based on a "compelling and sound business justification" pursuant to § 363(b). *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 603 (5th Cir. 2011). In its discussion, the Fifth Circuit proffered a key distinction that differentiated *ASARCO* from *O'Brien* and *Reliant*: the timing of the motion to the court in advance of the auction. *Id. at* 602-603.

B. **The Debtors Have Offered A Sound Business Justification for the Proposed Break-Up Fees That Overcomes the Committee's Objection**.

The purpose of a break-up fee is to induce the stalking horse bidder to enter into and pursue a transaction through an auction and closing. *Consider In re Fin. News Network, Inc.*, No. 91B-10891 (FGC), 1991 WL 127524, at *1 n.5 (Bankr. S.D.N.Y. May 10, 1991) *aff'd,* 134 B.R. 737 (S.D.N.Y. 1991) *aff'd,* 980 F.2d 165 (2d Cir. 1992) (the existence of a stalking horse agreement attracts other bidders to the auction). The stalking horse bidder spends substantial time and money performing due diligence and negotiating an agreement. In bankruptcy auctions, subsequent bidders will often forego due diligence because they gain the required comfort from the willingness of the stalking horse bidder to enter into the proposed agreement. This puts the first bidder at a significant disadvantage because other bidders will not incur the costs and risks of entering into the stalking horse agreement with the debtor. *Cf. Samjens*

3

*Partners I v. Burlington Indus. Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987) (discussing a break-up fee in the context of a board of directors' shifting duty in a corporate takeover).

It follows, then, that a break-up fee is not warranted if a signed asset purchase agreement will not benefit a proposed auction of a debtor's assets. In support of the proposed break-up fees, the Debtors offered the testimony of Emily Medine of the Debtors' sale advisor, Energy Ventures Analysis, Inc. Ms. Medine testified that signed Asset Purchase Agreements will provide substantial benefit to the sale process in these cases. She explained that she can use the Asset Purchase Agreements to force other bidders to commit to a sale and many lessors are unwilling to negotiate necessary amendments unless there is a signed agreement in place. Based on this testimony, the Court finds that the Debtors will receive substantial benefit from the presence of a break-up fee in the Asset Purchase Agreements.

The Committee does not necessarily dispute this, but argues the break-up fee is too high. The Debtors disagree. In support of the amount negotiated, Medine testified that the break-up fees are primarily based on the lost opportunity costs of the stalking horse bidder. She negotiated the break-up fee down to the current level, but her efforts to further reduce the fee were rebuffed. Medine therefore recommended the Debtors move forward with the Asset Purchase Agreements based on the benefits a stalking horse bidder would bring to the transaction, as previously described, and the unique facts of these cases.

Medine further explained that there are very few possible bidders for the Debtors' assets. The coal market in the United States is poor, particularly in the Appalachian region. Medine cited several causes: environmental improvements at coal-burning power plants which allow utilities to tap alternative coal sources; the strength of the dollar dampening the global demand for United States coal; and the glut of natural gas creating other options for end-users.

4

These problems not only lead to a lower demand, but result in far fewer parties willing to invest. The stalking horse bidder is only one of two active purchasers in this market with the financial ability to obtain replacement bonds. This is significant because the Debtors can only transfer permits if the underlying security bonds are replaced.

This unique position also means the stalking horse bidder has other opportunities that are larger, and therefore more attractive, than this transaction. Medine believes that the stalking horse bidder could switch to those potentially more lucrative options if it is not adequately protected through the break-up fees. Medine also explained that two other companies that might have acted as bidders recently filed bankruptcy. Therefore, not only are those companies no longer potential bidders, they are competing for the same small pool of buyers.

Medine offers valid and compelling reasons for the negotiated break-up fees. The Committee did not introduce any evidence to challenge the substance of this testimony. Notwithstanding Medine's testimony, the Committee argues the Court should look to actual costs incurred in approving the break-up fees and a lower percentage as compared to the relative purchase price is more appropriate.

This court has historically looked at the actual costs incurred in approving break-up fees. Medine testified that the stalking horse bidder is using in-house counsel and personnel to perform due diligence, including reviewing records and site visits. Therefore, the out-of-pocket costs are not significant. But Medine also testified that the stalking horse bidder will not agree to go forward without some break-up fee.

Further, it is difficult, if not impossible, to compare the break-up fee to the purchase price under the Asset Purchase Agreements. The parties have negotiated a unique consideration structure that does not allow an easy calculation of the percentage of the break-up fee to the total

consideration paid. Medine's testimony, the only evidence in the record, did not provide additional information that would allow this calculation.

Finally, the Committee argues the break-up fees would chill bidding. Break-up fees should not chill bidding. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *In re Integrated Res. Inc.*, 147 B.R. at 657. While a total break-up fee of $375,000.00 is not insignificant, it is not so large as compared to the proposed consideration that it would scare away a serious bidder.

Based on the evidence presented, the Court finds that the negotiated break-up fees in the Asset Purchase Agreements are based on the sound business judgment of the Debtors and the Committee has presented no compelling evidence or argument to counter the Debtors' decision.

### III. <u>CONCLUSION</u>.

Based on the foregoing, it is ORDERED the Committee' Objection [Doc. 214] is OVERRULED and the total proposed break-up fees of $375,000.00 in the Asset Purchase Agreements are APPROVED.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Friday, August 21, 2015
(grs)